JOSHUA OSBORNE-KLEIN (WSB #36736)      HONORABLE SAUNDRA B. ARMSTRONG
KRISTEN L. BOYLES (CSB #158450)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340
(206) 343-1526 *[FAX]*
josborne-klein@earthjustice.org
kboyles@earthjustice.org

SHELLEY DAVIS (CSB #84539)
VIRGINIA RUIZ (CSB #194986)
Farmworker Justice
1126 – 16th Street, N.W., Suite 270
Washington, D.C.  20036
(202) 293-5420
(202) 293-5427 *[FAX]*
sdavis@nclr.org
vruiz@nclr.org

*Attorneys for Plaintiffs*
*(complete list of parties on signature page)*

GREGORY C. LOARIE (CSB #215859)
Earthjustice
426 - 17th Street, 5th Floor
Oakland, CA  94612
(510) 550-6725
(510) 550-6749 *[FAX]*
gloarie@earthjustice.org

*Local Counsel for Plaintiffs*

MICHAEL MEUTER (CSB #161554)
JONATHAN GETTLEMAN (CSB #243560)
California Rural Legal Assistance, Inc.
3 Williams Road
Salinas, CA  93905
(831) 757-5221
(831) 757-6212
mmeuter@crla.org
jgettleman@crla.org

*Attorneys for Plaintiff Luis Garcia Lopez*

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -1-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, PESTICIDE ACTION NETWORK NORTH AMERICA, PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE, BEYOND PESTICIDES, TEAMSTERS LOCAL 890, FARM LABOR ORGANIZING COMMITTEE, AFL-CIO, and LUIS GARCIA LOPEZ, | Case No. 08-3595-SBA |
| Plaintiffs, | FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | |
| Defendant. | |

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -2-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

1.      This is an action for declaratory judgment and injunctive relief concerning the pesticide diazinon.  It arises under and asserts violations of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136-136y, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.[1]

2.      Diazinon is a toxic organophosphate pesticide.  The American public, including infants and children, are exposed to diazinon that drifts in the ambient air following application and contaminates food and drinking water.  Farmworkers are additionally exposed to diazinon when they mix, load, or apply the pesticide in fields or re-enter treated fields after application.  Diazinon contaminates the environment and poisons wildlife including threatened and endangered species.

3.      The United States Environmental Protection Agency ("EPA") has recognized that diazinon uses pose considerable risks to farmworkers and wildlife.  However, without completing the required ESA consultations, EPA determined that diazinon uses are eligible for reregistration under FIFRA because the benefits outweigh the risks.  In reaching this reregistration determination, EPA failed to put the burden of proving reregistration eligibility on the pesticide registrants and, instead, relied on incomplete and inaccurate risks and benefits assessments that significantly understate the risks of diazinon uses and exaggerate the benefits of the pesticide.

4.      Plaintiffs seek a judgment declaring that EPA acted arbitrarily, capriciously, and in violation of FIFRA in determining that diazinon was eligible for reregistration and in maintaining the registrations for diazinon.  Plaintiffs also seek an injunction that (1) requires EPA to make new reregistration eligibility decisions for diazinon based on a balancing of risks

---

[1] On May 27, 2008, plaintiff Beyond Pesticides sent a 60-day notice of intent to sue for EPA's failure to comply with the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, with respect to its reregistration of diazinon and maintenance of the diazinon registration.  More than 60 days have passed since EPA received that notice, yet EPA has neither responded to the notice nor taken action to correct the ESA violations identified therein.  Plaintiffs therefore amend their complaint pursuant to Fed. R. Civ. P. 15(a) to add a cause of action for violations of the ESA.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (CV08-3595-SBA)    -3-

1   and benefits under FIFRA's unreasonable adverse effects standard that fully incorporate the

2   health, environmental, economic, and social risks and benefits of each diazinon use; (2) prohibits

3   EPA from reregistering uses of diazinon unless the pesticide registrants prove that the benefits of

4   the pesticide use outweigh the specific risks associated with that use; and (3) imposes interim

5   protective measures to prevent harm to farmworkers, children, other bystanders in agricultural

6   communities near areas where diazinon is used until EPA brings its diazinon registrations into

7   compliance with the law.

8          5.       Additionally, EPA did not initiate and complete ESA section 7(a)(2) consultations

9   with the United States Fish and Wildlife Service ("FWS") and the National Marine Fisheries

10  Service ("NMFS") (collectively "the Services") on its diazinon reregistration to ensure that its

11  registered diazinon uses will not jeopardize the survival and recovery of threatened and

12  endangered species and will not adversely modify their designated critical habitat.  This action

13  seeks a judgment declaring that EPA has violated ESA section 7(a)(2) by reregistering and

14  allowing continued use of diazinon without completing consultations with the Services and

15  without ensuring that the registered diazinon uses will not jeopardize listed species and will not

16  adversely modify their designated critical habitat.  Plaintiffs seek an order (1) compelling EPA to

17  initiate and complete consultations with the Services regarding the effects of diazinon on

18  threatened and endangered species; and (2) granting interim protective measures to prevent harm

19  to listed species and their designated critical habitat until the consultation process is complete

20  and EPA brings the diazinon registrations into compliance with the ESA.

21                 JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

22         6.       This action is brought pursuant to section 16(a) of FIFRA, 7 U.S.C. § 136n(a), and

23  section 11(g)(1) of the ESA, 16 U.S.C. § 1540(g)(1).  This Court has jurisdiction pursuant to

24  7 U.S.C. § 136n(a), 16 U.S.C. § 1540(g)(1), and 28 U.S.C. § 1331.  As required by the ESA

25  citizen suit provision, plaintiff Beyond Pesticides provided a 60-day notice of intent to sue on

26  May 27, 2008, to the Services and defendant EPA.  A copy of the 60-day notice is appended as

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -4-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1    Exhibit A.

2        7.    Venue is properly vested in this Court under 28 U.S.C. § 1391(e) and 16 U.S.C.

3    § 1540(g)(3) as a number of the plaintiffs reside in this district and many of the consequences of

4    the defendant's violations of the law giving rise to the claims occurred or will occur in this

5    district.

6        8.    This case is properly assigned to the San Francisco/Oakland Division under Civil

7    L.R. 3-2(c) because at least one of the plaintiffs is located in San Francisco County.

8                                    PARTIES

9        9.    The plaintiffs in this action are:

10        A.    United Farm Workers ("UFW"), the nation's oldest and largest farmworker

11   membership organization.  UFW is headquartered in California and serves farmworkers in

12   offices all across the country including offices in Salinas and Santa Rosa, California.  UFW has

13   represented farm workers for more than 40 years and currently has more than 27,000 members,

14   many of whom are migrant and seasonal farmworkers.  UFW's mission is to protect and expand

15   farmworkers' labor rights, including rights pertaining to health and safety issues.  UFW works to

16   protect the health and safety of farmworkers from occupational injuries, including injuries

17   caused by exposure to diazinon and other pesticides.

18        B.    Pesticide Action Network North America ("PANNA"), a San Francisco-based

19   non-profit organization that serves as an independent regional center for Pesticide Action

20   Network International, a coalition of over 600 public interest organizations in more than 90

21   countries.  For more than 20 years, PANNA has worked to replace hazardous and unnecessary

22   pesticide uses with ecologically sound pest management across North America.  PANNA

23   provides scientific expertise, public education, and access to pesticide data and analysis, policy

24   development, and other support to its approximately 225 member organizations.  PANNA has

25   approximately 2,700 individual members nationwide and approximately 90 organizational

26   members in California alone.  PANNA's U.S. membership includes a number of groups who

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -5-

directly represent or advocate on behalf of farmworkers and whose membership includes

farmworkers and persons living on or near farms. PANNA submitted comments to EPA on the

2006 organophosphates cumulative risk assessment and the 2002 interim reregistration eligibility

decision for diazinon.

C.     Pineros y Campesinos Unidos del Noroeste (Northwest Treeplanters and

Farmworkers United or "PCUN"), based in Woodburn, Oregon, the state's only union of

farmworkers, nursery, and reforestation workers. Its mission is to establish better working and

living conditions for its members, who work on crops treated with diazinon, and live in

communities where this pesticide drifts and is tracked in following application.

D.     Beyond Pesticides, a nonprofit membership organization that serves a nationwide

network of individuals and groups working to increase the safe use of pesticides and reduce or

end the use of dangerous chemicals such as diazinon. Beyond Pesticides is based in Washington,

D.C., and has more than 2,000 individual and organizational members in California and other

states. The organization advocates on behalf of farmworkers, individuals, and communities

exposed to pesticides such as diazinon and also seeks to protect wildlife and ecosystems from the

harmful effects of diazinon and other pesticides. Beyond Pesticides' primary goal is to assist

individuals and organizations in identifying the hazards of pesticides, providing information on

safer alternatives, and promoting policy changes that increase the protections to humans and the

environment from dangerous pesticides. Beyond Pesticides has long campaigned for more

stringent regulation of diazinon. For example, on December 17, 2002, Beyond Pesticides

submitted comments that critiqued the EPA's diazinon interim reregistration decision. Beyond

Pesticides has also published fact sheets on the dangers of diazinon and has orchestrated public

letter writing campaigns urging EPA to cancel diazinon uses.

E.     Teamsters Local 890, a union founded in 1943 that represents approximately

10,000 workers in California and Arizona, including 2,000 agricultural workers in the Salinas

Valley, Oxnard area, Huron area, and Imperial Valley in California, as well as the Yuma area of

Arizona. The Union negotiates contracts to improve the members' wages and working

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -6-

conditions and works to protect its members from pesticide exposures and provide health care to farm workers and their families. Local 890's members include workers who have harvested and will continue to harvest vegetables treated with diazinon. Local 890's members and their families also live and go to school in areas where diazinon drifts and settles.

F.     Farm Labor Organizing Committee, AFL-CIO ("FLOC"), a national union that represents migrant and seasonal farmworkers. It was founded in 1968 and is based in Toledo, Ohio. FLOC's mission is to organize farmworkers so that they can secure more power to improve their working conditions, including reducing their exposure to pesticides. FLOC currently has approximately 12,000 members in Ohio, Michigan, North Carolina, and Virginia. FLOC members work with many crops that are registered to receive diazinon treatments, including apples, blueberries, cucumbers, onions, peppers, potatoes, strawberries, and tomatoes.

G.     Luis Garcia Lopez, an individual farmworker who has supported himself and his family for many years by working in agricultural fields in California. He has been exposed to diazinon and other pesticides while working in and around fields in Monterey County. Mr. Lopez plans to continue working in agriculture and is at risk of future exposure to diazinon and other pesticides.

10.     Plaintiffs have been and will continue to be injured when their members mix, load, and apply diazinon for agricultural purposes; prune, thin, or harvest crops that contain residues of diazinon; and work or live in areas where diazinon drifts and settles. Every year, plaintiffs' members are exposed to diazinon at levels that may cause poisoning. The continued exposure of the plaintiffs' members to the harmful effects of diazinon are a direct result of EPA's decisions to reregister diazinon uses.

11.     Plaintiff Beyond Pesticides and its members live, use, and recreate in areas near where diazinon is applied or where diazinon has traveled. Beyond Pesticides and its members have professional, economic, aesthetic, and recreational interests that have been and will continue to be injured by the reregistration of diazinon uses and the impacts that this pesticide has and will continue to have on beneficial insects and threatened and endangered species.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)     -7-

12.    The past, present, and future enjoyment of these interests by plaintiffs and their members have been, are being, and will continue to be irreparably harmed by EPA's disregard of its statutory duties and by the unlawful injuries imposed on farmworkers, children and other bystanders, and the environment.

13.    The aesthetic, conservation, recreational, commercial, and scientific interests of plaintiffs and their members in minimizing harm to people and the environment from the use of diazinon, as well as in the compliance with environmental law by federal agencies, have been, are being, and, unless the relief prayed for is granted, will continue to be directly and adversely affected by the failure of defendants to comply with the law.

14.    The defendant in this action is the United States Environmental Protection Agency, an agency of the United States charged with registering and reregistering pesticides under FIFRA and with ensuring that the authorized pesticide uses will not pose unreasonable risks to humans or the environment.  EPA is also charged with ensuring, through consultation with the Services, that pesticide registrations will not jeopardize the survival and recovery of listed species or destroy or adversely modify their designated critical habitat.

BACKGROUND

I.    STATUTORY FRAMEWORK FOR REGISTERING AND REREGISTERING PESTICIDES

A.    Federal Insecticide, Fungicide, and Rodenticide Act Requirements

15.    FIFRA establishes a registration scheme for pesticides.  Under FIFRA, a pesticide may generally not be sold or used in the United States unless it has an EPA registration for a specified use.  7 U.S.C. § 136a(a).  To register or reregister a pesticide, EPA must determine that:

(A)    its composition is such as to warrant the proposed claims for it;
(B)    its labeling and other material required to be submitted comply with the requirements of this Act;
(C)    it will perform its intended function without unreasonable adverse effects on the environment; and

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (CV08-3595-SBA)    -8-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

(D)     when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

7 U.S.C. § 136a(c)(5).

16.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide . . . ." 7 U.S.C. § 136(bb). In order for EPA to register or reregister a pesticide use, it must find that the use will not pose any unreasonable adverse effects because the benefits of the pesticide uses outweigh the risks.

17.     FIFRA also defines "unreasonable adverse effects on the environment" to include any human dietary risk that is not "safe" under the Federal Food Drug and Cosmetic Act ("FFDCA"), 21 U.S.C. §§ 301-394, as amended by the Food Quality Protection Act ("FQPA"), Pub. L. No. 104-170, 110 Stat. 1489 (1996). 7 U.S.C § 136(bb). The FFDCA, as amended, defines "safe" as "a reasonable certainty that no harm will result from aggregate exposure to the pesticide residue, including all anticipated dietary exposures and all other exposures for which there is reliable information." 21 U.S.C. §§ 346a(b)(2)(A)(i)-(ii).

18.     The culmination of the registration process is EPA's approval of both a registration and a label for the particular pesticide use. FIFRA makes it unlawful to use a pesticide in a manner inconsistent with the label, 7 U.S.C. § 136j(2)(G), or to make any claims that differ substantially from the label, 7 U.S.C. § 136j(1)(B).

19.     EPA has the authority to cancel a pesticide registration whenever the "pesticide or its labeling or other material required to be submitted does not comply with the provisions of [FIFRA] or, when used in accordance with widespread and commonly recognized practice, generally causes unreasonable adverse effects on the environment . . . ." 7 U.S.C. § 136d(b).

20.     EPA separately categorizes and assesses risks to farmworkers, children and bystanders (non-occupational risks), and wildlife. For farmworker risks, EPA typically uses a methodology that combines exposure estimates, toxicity assessments, and uncertainty factors to determine whether a particular pesticide use poses a "risk of concern" to farmworkers, which it

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (CV08-3595-SBA)     -9-

has also called an "unacceptable risk." When EPA determines that a pesticide use presents a risk of concern to farmworkers, it generally prescribes mitigation measures including use of personal protective equipment (such as chemical resistant clothing and respirators), and engineering controls (such as closed pesticide mixing, loading, and application systems designed to reduce contact with the poisons).

21.     For children and bystanders, both FIFRA and the FFDCA require EPA to evaluate potential exposures from dietary sources and from other non-occupational routes. EPA generally uses the "reasonable certainty of no harm" standard set forth in the FFDCA to assess dietary risks to children and bystanders; however, EPA typically does not consider or assess the risks to children and bystanders from exposure to pesticides that drift into communities following application under either the FIFRA or FFDCA standard.

22.     For wildlife, EPA typically establishes ecological risks of concern based on laboratory toxicity studies and environmental fate modeling. When EPA identifies a risk of concern for wildlife, the agency sometimes prescribes mitigation measures including no-application buffer zones around sensitive areas, reductions in permitted number of seasonal applications, and reductions in maximum application rates.

23.     Under FIFRA's risk-benefit standard, EPA cannot allow pesticide uses that result in human or ecological risks to persist unless the pesticide registrant proves that, considering all risks and benefits, the benefits of the pesticide use outweigh the risks.

24.     EPA has no regulation or policy establishing a uniform process for assessing the benefits of pesticide uses that pose risks of concern to humans and/or wildlife. Expert bodies, such as the National Academy of Sciences, have recommended that EPA develop such a policy to avoid arbitrary and unprincipled risk-benefit decisionmaking under FIFRA. In the absence of such a regulation or policy, EPA staff compiles information on the risks and benefits of pesticides on an *ad hoc* basis.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)     -10-

B.    <u>Endangered Species Act Mandates</u>

25.    Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical."  16 U.S.C. § 1536(a)(2).

26.    Section 7 establishes an interagency consultation process to assist federal agencies in complying with their duty to ensure against jeopardy to listed species or destruction or adverse modification of critical habitat.  An agency must initiate consultation with NMFS or FWS under section 7 whenever it takes an action that "may affect" a listed species.  50 C.F.R. § 402.14(a).  The threshold for a "may affect" determination and required ESA section 7 consultation is low.  <u>See</u> 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement.").

27.    As a result of consultation, the federal agency will obtain either a written concurrence letter from NMFS or FWS that the proposed action is "not likely to adversely affect" listed species or their habitat, 50 C.F.R. §§ 402.13, 402.14(b)(1), or a biological opinion evaluating the effects of the federal action on listed species and their critical habitat.  50 C.F.R. § 402.14(a).  If NMFS or FWS concludes that a proposed action is likely to jeopardize a listed species or result in adverse modification of its critical habitat, NMFS or FWS must propose a reasonable and prudent alternative, if available, that will mitigate the proposed action so as to avoid jeopardy and/or adverse modification of critical habitat.  16 U.S.C. § 1536(b)(3).

28.    Separately, ESA section 7(d) prohibits federal agencies, after the initiation of consultation under section 7(a)(2), from making any irreversible or irretrievable commitment of resources if doing so would foreclose the implementation of reasonable and prudent alternatives. 16 U.S.C. § 1536(d).

29.    Federal agencies and the Services must use the best available science and commercial data in their section 7(a)(2) consultations.  16 U.S.C. § 1536(a)(2).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

II.     DIAZINON

  A.     <u>History and Usage</u>

  30.     Diazinon is an organophosphate insecticide that was first registered for use in 1956.  Like other organophosphate pesticides, diazinon originates from nerve gases developed by the Nazis during World War II.

  31.     Today, diazinon is one of the most widely used organophosphate insecticides in the United States.  EPA estimates that total annual domestic usage of diazinon was over 13 million pounds of active ingredients between 1987 and 1997.  Diazinon is currently registered for use on a wide variety of crops including almonds, apples, apricots, beets, beans, blueberries, broccoli, Brussels sprouts, cabbage, caneberries, carrots, cauliflower, celery, chard, cherries, collards, cranberries, cucumbers, endive, figs, filberts, ginseng, kale, lettuce, melons, mustard greens, nectarines, onions, ornamentals, parsley, parsnips, peaches, pears, peas, peppers, pineapples, plums, potatoes, prunes, radishes, rutabagas, strawberries, spinach, tomatoes, trunk wraps, turnips, and watercress.

  32.     In 1989, FWS issued a biological opinion for the then-registered diazinon uses.  FWS determined diazinon jeopardized 84 threatened and endangered aquatic species and four listed avian species.  Diazinon IRED at 31.  FWS prescribed mitigation measures to avoid jeopardizing such species.  Diazinon IRED at 31.  On information and belief, EPA never implemented the mitigation prescribed in the 1989 biological opinion.  Diazinon IRED at 32.

  33.     Pursuant to court orders, EPA has begun to initiate ESA section 7(a)(2) consultations on the effects of diazinon on listed salmon and steelhead populations, the California red-legged frog, and the Barton Springs salamander.  However, EPA has allowed diazinon uses to continue that may affect those species even though the ESA consultations are not complete.

  34.     On July 31, 2008, pursuant to a settlement agreement, NMFS released a draft biological opinion responding to EPA's initiation of consultation on the effects of diazinon and two other organophosphate insecticides on listed salmon and steelhead.  In that draft, NMFS

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)     -12-

questioned many of EPA's methodologies for assessing the impacts of diazinon on salmon and

steelhead, and determined that EPA's reregistration of diazinon "is likely to jeopardize the

continued existence" of 28 different threatened and endangered salmon and steelhead

populations.  Draft Biological Opinion on EPA's Registration of Pesticides Containing

Chlorpyrifos, Diazinon, and Malathion at 303.  NMFS noted that EPA's consultation under

section 7(a)(2) of the ESA "remains incomplete until it analyzes the effects of its authorization of

pesticide product labels with … diazinon … for all remaining threatened and endangered species

under NMFS jurisdiction."  Id. at 39.

        B.     Toxicity and Environmental Fate

      35.     Diazinon is toxic to humans.  Like other organophosphates, diazinon causes

systemic illnesses by inhibiting the ability to produce cholinesterase, an enzyme necessary for

the proper transmission of nerve impulses.  Symptoms of cholinesterase inhibition include

muscle spasms, confusion, dizziness, loss of consciousness, seizures, abdominal cramps,

vomiting, diarrhea, cessation of breathing, paralysis, coma, and death.  Scientific studies also

associate diazinon exposures with several other ailments including endocrine disruption, birth

defects, nerve damage, liver damage, asthma, gestational diabetes, and non-Hodgkin's

lymphoma.

      36.     Diazinon has both lethal and sub-lethal effects on wildlife.  Birds, particularly

grazing fowl like ducks and geese, are highly susceptible to diazinon poisoning, and diazinon has

been linked to hundreds of reported bird kills.  Indeed, according to EPA's Ecological Incident

Information System, diazinon has caused the second largest number of total known incidents of

bird mortality of any pesticide.  Diazinon is also lethal to aquatic life and, according to peer-

reviewed studies, low concentrations of diazinon in surface water can have sub-lethal effects on

fish, including impairment of homing ability, reproduction, and predator avoidance.  In the draft

biological opinion released on July 31, 2008, NMFS determined salmon and steelhead "survival,

reproduction, migration, and growth are all significantly reduced by" EPA's registration of

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -13-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

diazinon and two other organophosphates.  Draft Biological Opinion on EPA's Registration of Pesticides Containing Chlorpyrifos, Diazinon, and Malathion at 300.

37.    Diazinon is semi-volatile and can become airborne after application.  It has been detected in the air near schools and homes in agricultural communities.  For example, air monitoring conducted by the California Air Resources Board in 1998 found detectable levels of diazinon in the air at schools and other monitoring sites in Fresno County, California.  A 2006 monitoring study PANNA conducted at the South Woods Elementary School in Hastings, Florida, detected diazinon at quantities exceeding levels-of-concern for young children that were derived from EPA data.

38.    Diazinon is also frequently detected in surface waters.  According to EPA, "[d]iazinon was the most frequently detected insecticide in surface water monitoring studies . . . ."  Diazinon IRED at 11.  According to NMFS, diazinon was detected in 67% of surface water samples taken in California's salmon and steelhead habitat between 1990 and 2005.  Draft Biological Opinion on EPA's Registration of Pesticides Containing Chlorpyrifos, Diazinon, and Malathion at 225.  Numerous waterbodies are listed as impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), due to contamination of diazinon from agricultural sources.

C.    EPA's Reregistration Eligibility Decisions

39.    EPA issued an interim reregistration eligibility decision for diazinon on July 31, 2002 ("Diazinon IRED"), which it revised on May 13, 2004 ("IRED Revision").  In those decisions, EPA identified many "risks of concern" to farmworkers and wildlife resulting from diazinon uses and prescribed mitigation to reduce these risks, including use of personal protective equipment (such as chemical resistant clothing and respirators), use of engineering controls (such as closed pesticide mixing, loading, and application systems designed to reduce contact with the poisons), use restrictions, and reductions in maximum application rates.  EPA acknowledged that such mitigation would not eliminate the risks of concern to farmworkers and

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (CV08-3595-SBA)    -14-

wildlife but nonetheless concluded that such uses were eligible for reregistration under FIFRA.

40.    Specifically, EPA found that all diazinon mixing, loading, and application scenarios presented "unacceptable" risks of concern to farmworkers, even if EPA required use of personal protective equipment. Diazinon IRED at 18. And even with implementation of engineering controls, EPA found that 118 of the 136 short-term exposure scenarios presented risks of concern to farmworkers who mix, load, or apply diazinon. See Diazinon IRED at 19-21.

41.    EPA also concluded that diazinon uses posed "post-application" risks of concern to farmworkers who come into contact with diazinon residues on crops following application. EPA determined that up to 18-day "re-entry intervals" (period of time in which workers may not enter fields treated with diazinon) and 45-day "pre-harvest intervals" (period of time in which harvesting activities are prohibited following application) were needed to eliminate risks of concern resulting from post-application activities. Diazinon IRED at 22-23.

42.    EPA found that diazinon uses resulted in risks of concern to birds, mammals, aquatic species, and threatened and endangered species. Diazinon IRED at 28-32. According to the agency, "[d]iazinon has caused widespread and repeated mortality of birds [and that m]ortality is likely to continue in the future if diazinon continues to be used on sites where birds can be exposed." Diazinon IRED at 31. EPA likewise acknowledged that "[d]iazinon is highly toxic to bees and other beneficial insects on an acute contact basis," is "moderately toxic to very highly toxic to freshwater fish," and "is very highly toxic to aquatic invertebrates on an acute basis . . . ." Diazinon IRED at 26.

43.    While EPA prescribed some mitigation to reduce farmworker and wildlife risks, in many cases the agency carved out exceptions to the mitigation for specific diazinon uses. For example, EPA cancelled all granular registrations of diazinon except for use on lettuce in California and Arizona and for two current local registrations held by Washington and Oregon for control of the cranberry girdler. IRED Facts at 3. Likewise, EPA eliminated aerial application for all uses except for one application per crop for lettuce. IRED Facts at 3. EPA similarly deleted foliar application on all vegetable and fruit crops except for leafhopper on

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -15-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1  honeydew melons in California and one application per crop for lettuce. IRED Facts at 3. And

2  EPA required closed cabs for motorized ground equipment application *except* for applications to

3  apples and lettuce. IRED Revision at 2.

4     44.    EPA's primary justification for allowing diazinon risks of concern to persist, and

5  for exempting certain uses from the general mitigation measures prescribed in the IRED, was its

6  assertion that the benefits of diazinon to growers outweigh the risks from such uses. However,

7  EPA's conclusion that diazinon uses provided important benefits to growers is not substantiated

8  by the facts. For example, EPA conceded that only five percent of the honeydew melon crop is

9  treated with diazinon. Diazinon IRED at 6. The low usage of diazinon indicates that honeydew

10  growers have found efficacious alternatives to diazinon and that cancellation of the honeydew

11  use would not significantly affect grower revenues. Yet EPA allowed diazinon use on honeydew

12  to continue and, in the 2004 IRED Revision, extended the phase-out for foliar applications on

13  honeydew melons indefinitely. IRED Revision at 1.

14     45.    Indeed, EPA assessed benefits for only a limited number of crops—those with

15  five percent or more of total acreage receiving diazinon treatments. Diazinon IRED at 42. Using

16  this cut-off, EPA did not conduct a benefits assessment for diazinon use on apples. Diazinon

17  IRED at 42. Nonetheless, EPA concluded that diazinon uses on apples are eligible for

18  reregistration, Diazinon IRED at 42, and, in the 2004 Revision, exempted apples from the

19  enclosed cab mitigation it prescribed for all other diazinon uses, IRED Revision at 1.

20     46.    EPA's failure to consider the benefits of many diazinon uses was compounded by

21  the agency's failure to assess several important factors bearing on the risks that the pesticide

22  poses to humans. For example, EPA failed to consider diazinon exposures to children and

23  bystanders that occur when the pesticide drifts from the fields into homes, schools, and

24  playgrounds following application; EPA only considered child and bystander exposures from

25  food and drinking water contamination. See Diazinon IRED at 36-37. Both FIFRA and the

26  FFDCA require EPA to assess child and bystander exposures from pesticide drift; however, EPA

27  did not examine such exposures under either FIFRA's "unreasonable adverse effects" standard or

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -16-

1    the FFDCA's "reasonable certainty of no harm" standard.

2    47.    EPA failed to consider many other critical factors bearing on diazinon's

3    reregistration eligibility, including but not limited to (a) the risks to humans and wildlife from the

4    diazinon degradates, which EPA acknowledged could pose additional risks to both humans and

5    wildlife; (b) the risks to humans and wildlife resulting from the endocrine disrupting properties

6    of diazinon; (c) the post-application risks to farmworkers from nut tree and cut flower uses of

7    diazinon; (d) waterbody listings under section 303(d) of the Clean Water Act caused by diazinon

8    contamination from agricultural sources; (e) the acute toxicity of diazinon to estuarine and

9    marine fish and invertebrates; and (f) the sub-lethal effects of diazinon on fish.

10    48.    The Diazinon IRED was called "interim" because EPA still had to complete a

11    cumulative risk assessment for all organophosphates and make appropriate adjustments in food

12    tolerances in order to comply with the FQPA.  On July 31, 2006, upon completing its

13    Organophosphate Cumulative Risk Assessment, EPA re-affirmed its reregistration eligibility

14    decisions for diazinon without change.  It concluded that the Cumulative Risk Assessment

15    compelled no changes in the Diazinon IRED and that the diazinon uses covered by the IRED

16    continue to be eligible for reregistration.  EPA Memorandum Finalizing IREDs for

17    Organophosphate Pesticides (July 31, 2006).  In making this determination, EPA did not address

18    or incorporate new data that had been submitted to the agency following completion of the IRED

19    on the risks and benefits of diazinon.

20    CLAIMS FOR RELIEF

21    FIRST CLAIM FOR RELIEF
      Violation of FIFRA:
22    Failure to Consider All Factors Necessary to Evaluate "Unreasonable Adverse Effects"
      From Reregistering Diazinon
23

24    49.    In order to register or reregister a pesticide use, EPA must determine that the use

25    "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C.

26    §§ 136a(c)(5).  FIFRA defines "unreasonable adverse effects on the environment" to mean "any

27    unreasonable risk to man or the environment, taking into account the economic, social, and

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -17-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1    environmental costs and benefits of the use of any pesticide . . . ."  7 U.S.C. § 136(bb).  In order

2    to satisfy this standard, EPA must consider all relevant health, environmental, economic, and

3    social risks and benefits of the pesticide use and determine that the benefits outweigh the risks.

4    The pesticide registrant bears the burden of proving that the benefits of a pesticide use outweigh

5    the risks.

6         50.    In determining that diazinon uses are eligible for reregistration under FIFRA, and

7    in maintaining the diazinon registrations, EPA failed to place the burden of proving registration

8    eligibility on the pesticide registrants and failed to conduct a complete assessment of the risks

9    and benefits of diazinon uses.  The critical omissions in EPA's diazinon assessments include but

10   are not limited to EPA's failure to consider and adequately assess: (a) risks to children and

11   bystanders from diazinon that drifts into communities following application; (b) risks to humans

12   and wildlife from the toxic degradates of diazinon; (c) risks to humans and wildlife from the

13   endocrine disrupting properties of diazinon; (d) risks to estuarine and marine fish and

14   invertebrates from diazinon runoff; (e) the sub-lethal effects of diazinon on wildlife; (f) surface

15   waters listed as impaired due to diazinon contamination from agricultural sources; and

16   (g) benefits of diazinon on crops such as apples for which less than five percent of total acreage

17   receives diazinon treatments.

18        51.    Because EPA failed to consider and adequately assess many important factors

19   bearing on the risks and benefits of diazinon, including but not limited to those listed above, EPA

20   lacked a basis for determining that the benefits of diazinon uses outweigh the risks.  By failing to

21   put the burden on the registrants to prove reregistration eligibility and conduct a complete risk-

22   benefit assessment that considers all important factors relevant to diazinon's reregistration

23   eligibility, EPA's decision that diazinon is eligible for reregistration was arbitrary, capricious,

24   and contrary to FIFRA.

25

26

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -18-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

SECOND CLAIM FOR RELIEF
Violation of FIFRA:
Failure to Rationally Balance Risks and Benefits of Diazinon Reregistration

52.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide . . . ." 7 U.S.C. § 136(bb).  In order to satisfy this standard, EPA must consider all relevant health, environmental, economic, and social risks and benefits of the pesticide use and determine that the benefits outweigh the risks. The pesticide registrant bears the burden of proving that the benefits of a pesticide use outweigh the risks.

53.    Despite the flaws in EPA's diazinon risk and benefit assessments, EPA admitted that some diazinon uses pose substantial risks to humans and the environment and provide only marginal benefits to growers.  EPA proffered no rationale for how these marginal benefits outweigh the substantial risks posed by diazinon.  EPA's failure to articulate any rational connection between its risk and benefit findings and its ultimate decision that diazinon uses were eligible for reregistration was arbitrary, capricious, and contrary to FIFRA.

THIRD CLAIM FOR RELIEF
Violation of the Endangered Species Act:
Failure to Consult on Impacts to Threatened and Endangered Species
From Registration of Diazinon

54.    Under section 7(a)(2) of the ESA, "[e]ach federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."  16 U.S.C. § 1536(a)(2).

55.    To fulfill the substantive mandate in section 7(a)(2), the ESA requires federal agencies to consult with the Services whenever a federal action "may affect" a listed species or designated critical habitat.  50 C.F.R. § 402.14(a).  The threshold for a "may affect" determination and the required ESA section 7(a)(2) consultation is low.  See 51 Fed. Reg. 19926, 19949 (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse or of an

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -19-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

undetermined character, triggers the formal consultation requirement.").

56.    In its reregistration eligibility decisions for diazinon, EPA found that uses of diazinon pose "risks of concern" to many threatened and endangered species.  These findings equate to "may affect" findings and trigger the ESA consultation mandate.  However, EPA has not completed any of the required diazinon consultations.  And, since the 2002 diazinon reregistration decision, EPA has only begun to initiate consultations for a few of the many species that may be affected by diazinon.  EPA's failure to initiate and complete consultations on actions that "may affect" listed species violates the Endangered Species Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

A.    Adjudge and declare that EPA acted arbitrarily, capriciously, and contrary to FIFRA in reregistering uses of diazinon;

B.    Adjudge and declare that EPA violated section 7(a)(2) of the ESA by reregistering diazinon uses and maintaining diazinon reregistrations without initiating and completing consultations with the Services and without ensuring that the reregistered uses will not jeopardize the survival and recovery of threatened and endangered species or destroy or adversely modify their designated critical habitat;

C.    Order EPA to either cancel diazinon or make a new reregistration eligibility decision for diazinon on an expeditious basis in which EPA: (1) makes unreasonable adverse effects determinations based on full consideration and balancing of environmental, health, economic, and social risks and benefits from diazinon uses, including all risks to children and other bystanders; (2) reregisters a diazinon use only when the pesticide registrants have proved that the health, environmental, economic, and social benefits outweigh the risks; and (3) ensures, based on completed section 7(a)(2) consultations, that the reregistered diazinon uses will not jeopardize the survival and recovery of threatened and endangered species or destroy or adversely modify their critical habitat;

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -20-

D.     Order EPA to consult with the Services pursuant to section 7(a)(2) of the ESA on any diazinon uses that "may affect" a listed species and ensure, based on those consultations, that the diazinon registrations will not jeopardize the survival and recovery of listed species or adversely modify their critical habitat;

E.     Order interim protective measures to prevent harm to farmworkers, children, and other bystanders while EPA makes new reregistration decisions for diazinon;

F.     Order interim protective measures to prevent harm to threatened and endangered species and their designated critical habitat until the ESA section 7(a)(2) consultation process is complete and EPA has brought diazinon registration into compliance with the ESA;

G.     Award plaintiffs UFW, PANNA, PCUN, Beyond Pesticides, Teamsters Local 890, FLOC, and Luis Garcia Lopez their reasonable expenses, costs, and disbursements, associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412;

H.     Award plaintiffs UFW, PANNA, PCUN, Beyond Pesticides, Teamsters Local 890, FLOC, and their counsel Earthjustice and Farmworker Justice only, their reasonable fees, including attorneys' fees associated with this litigation, under the Equal Access to Justice Act, 28 U.S.C. § 2412;

I.     Award plaintiff Beyond Pesticides its reasonable fees, expenses, costs, and disbursements, including attorneys' fees associated with this litigation under the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(4);

J.     Grant plaintiffs such further and additional relief as the Court may deem just and proper.

1

Respectfully submitted this 4th day of August, 2008.

2

3

/s/  Kristen L. Boyles

4

KRISTEN L. BOYLES (CSB #158450)
JOSHUA OSBORNE-KLEIN (WSB #36736)

5

Earthjustice
705 Second Avenue, Suite 203

6

Seattle, WA  98104

7

(206) 343-7340
(206) 343-1526 *[FAX]*

8

josborne-klein@earthjustice.org
kboyles@earthjustice.org

9

10

GREGORY C. LOARIE (CSB #215859)
Earthjustice

11

426 - 17th Street, 5th Floor
Oakland, CA  94612

12

(510) 550-6725
(510) 550-6749 *[FAX]*

13

gloarie@earthjustice.org

14

SHELLEY DAVIS (CSB #84539)

15

VIRGINIA RUIZ (CSB #194986)
Farmworker Justice

16

1126 – 16th Street, N.W., Suite 270
Washington, D.C.  20036

17

(202) 293-5420
(202) 293-5427 *[FAX]*

18

sdavis@nclr.org

19

vruiz@nclr.org

20

*Attorneys for Plaintiffs United Farm Workers,*
*Pesticide Action Network North America, Pineros y*

21

*Campesinos Unidos del Noroeste, Beyond*
*Pesticides, Teamsters Local 890, and Farm Labor*

22

*Organizing Committee, AFL-CIO*

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -22-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

MICHAEL MEUTER (CSB #161554)
JONATHAN GETTLEMAN (CSB #243560)
California Rural Legal Assistance, Inc.
3 Williams Road
Salinas, CA  93905
(831) 757-5221
(831) 757-6212
mmeuter@crla.org
jgettleman@crla.org

*Attorneys for Plaintiff Luis Garcia Lopez*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF (CV08-3595-SBA)    -23-

CERTIFICATE OF SERVICE

I am a citizen of the United States and a resident of the State of Washington.  I am over 18 years of age and not a party to this action.  My business address is 705 Second Avenue, Suite 203, Seattle, Washington 98104.

I hereby certify that on August 4, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

No Appearances Have Been Filed

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

| | |
|---|---|
| Stephen Johnson | ☐ via facsimile |
| Administrator | ☐ via overnight courier |
| Environmental Protection Agency | ☒ via first-class U.S. mail |
| Ariel Rios Building | ☐ via hand delivery |
| 1200 Pennsylvania Avenue, N.W. | ☐ via e-mail |
| Mail Code: 1101A | ☐ via electronic service by Clerk |
| Washington, D.C.  20460 | |

I, Catherine Hamborg, declare under penalty of perjury that the foregoing is true and correct.  Executed on this 4th day of August, 2008, at Seattle, Washington.

Catherine Hamborg

CERTIFICATE OF SERVICE
(Case No. CV08-3595-SBA)   -1-

# EXHIBIT A



BOZEMAN, MONTANA   DENVER, COLORADO   HONOLULU, HAWAI'I
INTERNATIONAL   JUNEAU, ALASKA   OAKLAND, CALIFORNIA
SEATTLE, WASHINGTON   TALLAHASSEE, FLORIDA   WASHINGTON, D.C.

May 27, 2008

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Stephen Johnson
Administrator
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, D.C.  20460

Carlos Gutierrez
Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Avenue, N.W., Room 5854
Washington, D.C.  20230

Dirk Kempthorne
Secretary of the Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C.  20240

> Re:   60-Day Notice of Endangered Species Act Violations Concerning EPA's
>        Reregistration of the Organophosphate Pesticide Diazinon

Greetings:

On behalf of Beyond Pesticides, we ask that the Environmental Protection Agency ("EPA") take immediate action to remedy its violations of the Endangered Species Act ("ESA"). EPA is in violation of section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), because it failed to consult with the Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS") (collectively "the Services") to ensure that diazinon, an EPA-registered organophosphate pesticide, does not jeopardize listed species or adversely modify their designated critical habitat.  Additionally, EPA is in violation of section 7(d) of the ESA, 16 U.S.C. § 1536(d), for allowing continued diazinon uses prior to completion of consultations it has initiated for Pacific salmon and steelhead, the California red-legged frog, and the Barton Springs salamander.  This letter provides legal notice required by section 11(g) of the ESA, 16 U.S.C. § 1540(g), prior to commencement of legal action.

705 SECOND AVE., SUITE 203   SEATTLE, WA  98104-1711
T: 206.343.7340   F: 206.343.1526   E: eajuswa@earthjustice.org   W: www.earthjustice.org

Stephen Johnson, Carlos Gutierrez,
Dirk Kempthorne
May 27, 2008
Page 2

## BACKGROUND

Diazinon is an organophosphate insecticide that was first registered in 1956. Pursuant to an agreement with the diazinon registrants, EPA began a phase-out of residential uses of diazinon in 2000 due to the risks of diazinon to children and the environment. However, in 2002 and 2006, EPA reregistered agricultural uses of diazinon on many crops including but not limited to nuts, apples, pears, stone fruits, beets, onions, spinach, berries, grapes, broccoli, melons, cranberries, and lettuce. See Diazinon Interim Reregistration Eligibility Decision ("IRED") at 19-21. Today, diazinon is one of the most common agricultural pesticides in the United States; approximately 4 million pounds of diazinon active ingredient are used annually.

Environmental contamination of diazinon is pervasive. The United States Geological Survey has determined that diazinon is one of the most commonly found insecticides in surface water nationally. Exposure to diazinon can harm wildlife by disrupting their nervous systems. Specifically, like other organophosphates, diazinon interferes with the acetylcholinesterase enzyme, which is necessary for normal transmission of nerve impulses. The mild symptoms of diazinon poisoning include headache, dizziness, weakness, feelings of anxiety, constriction of the pupils, and blurred vision. More severe symptoms include nausea, vomiting, abdominal cramps, slow pulse, diarrhea, pinpoint pupils, difficulty breathing, coma, and death. Exposure to diazinon is also linked to endocrine disruption, developmental effects, mutagenic effects, and cancer. According to EPA's Ecological Incident Information System, diazinon has caused the second largest number of total known incidents of bird mortality of any pesticide.

In a 1989 Biological Opinion, FWS found that 132 listed species were potentially affected by diazinon use. Of these organisms, FWS listed 84 aquatic species as jeopardized, the majority of which were endangered or threatened species of freshwater fish. IRED at 31. While EPA has never imposed the mitigation measures prescribed in the 1989 biological opinion, between 2002 and 2007 EPA began to initiate consultations with NMFS and FWS after determining that diazinon may affect 26 listed salmon and steelhead populations, the California red-legged frog, and the Barton Springs salamander. Those consultations have never been completed.

## EPA VIOLATED ESA § 7 BY FAILING TO CONSULT ON THE DIAZINON REREGISTRATION

I. LEGAL FRAMEWORK

The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") prohibits the use of a pesticide in the United States unless EPA has registered the pesticide for the particular use. 7 U.S.C. § 136a(a). EPA may only register a pesticide use if it determines that "when used in

Stephen Johnson, Carlos Gutierrez,
Dirk Kempthorne
May 27, 2008
Page 3

accordance with widespread and commonly recognized practice" the pesticide "will not generally cause unreasonable adverse effects on the environment." Id. at § 136a(c)(5). FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide . . . ." Id. at § 136(bb).

After registering or reregistering a pesticide use, EPA retains discretionary involvement and control over that registration. EPA has the authority to cancel pesticide registrations whenever "a pesticide or its labeling or other material required to be submitted does not comply with the provisions of [FIFRA] or, when used in accordance with widespread and commonly recognized practice, generally causes unreasonable adverse effects on the environment." 7 U.S.C. § 136d(b). EPA must periodically review pesticide registrations, and should strive to complete such reviews every 15 years. Id. at § 136a(g)(1).

When EPA reregisters or maintains a pesticide registration under FIFRA, it triggers substantive obligations under section 7 of the ESA. 50 C.F.R. § 402.02; Washington Toxics Coal. v. EPA, 413 F.3d 1024, 1033 (9th Cir. 2005). Specifically, ESA § 7(a)(2) requires that "[e]ach federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). The substantive obligation to "insure" against a likelihood of jeopardy or adverse modification requires the agencies to give the benefit of the doubt to endangered species and to place the burden of risk and uncertainty on the proposed action. See Sierra Club v. Marsh, 816 F.2d 1376, 1386 (9th Cir. 1987). The duty imposed by section 7(a)(2) is constant, relieved only by an exemption from the Endangered Species Committee. 16 U.S.C. § 1536(h); Conner v. Burford, 848 F.2d 1441, 1452 n.26 (9th Cir. 1988).

To fulfill its substantive section 7(a)(2) obligation, the ESA requires federal agencies to consult with the Services on each agency action that "may affect" a listed species, such as a pesticide reregistration. See 50 C.F.R. § 402.14(a). The Ninth Circuit Court of Appeals has construed the term "action" broadly. See Pac. Rivers Council v. Thomas, 30 F.3d 1050, 1054-55 (9th Cir. 1994); Conner v. Burford, 868 F.2d 1441, 1453 (9th Cir. 1988). As a result of the consultation process, the federal agency that initiated the consultation will obtain either a written concurrence letter from NMFS or FWS that the proposed action is "not likely to adversely affect" listed species or their habitat, 50 C.F.R. §§ 402.13, 402.14(b)(1), or a biological opinion evaluating the effects of the federal action on listed species and their critical habitat. 50 C.F.R. § 402.14(a); see generally Thomas v. Peterson, 753 F.2d 754, 763 (9th Cir. 1985). If NMFS or FWS concludes that a proposed action is likely to jeopardize a listed species or result in adverse modification of its critical habitat, NMFS or FWS must propose a reasonable and prudent alternatives, if available, that will mitigate the proposed action so as to avoid jeopardy and adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3).

Stephen Johnson, Carlos Gutierrez,
Dirk Kempthorne
May 27, 2008
Page 4


        Section 7(d) of the ESA prohibits federal action agencies, after the initiation of
consultation under section 7(a)(2), from making any irreversible or irretrievable commitment of
resources if doing so would foreclose the implementation of reasonable and prudent alternatives.
16 U.S.C. § 1536(d); Natural Res. Defense Council v. Houston, 146 F.3d 1118, 1128 (9th Cir.
1998) (section 7(d) violated where Bureau of Reclamation executed water service contracts prior
to completion of formal consultation); Marsh, 816 F.2d at 1389 (construction of highway outside
species habitat barred by section 7(d) pending completion of consultation).  This prohibition is
not an exception to the requirements of section 7(a)(2); it is in addition to the requirements of
section 7(a)(2) and helps to ensure that the section 7(a)(2) substantive mandate is met.  See, e.g.,
Pac. Rivers Council v. Thomas, 30 F.3d 1050 (9th Cir. 1994); Greenpeace v. NMFS, 80 F. Supp.
2d 1137 (W.D. Wash. 2000).

II.      THE REREGISTRATION OF DIAZINON "MAY AFFECT" THREATENED AND
         ENDANGERED SPECIES AND ADVERSELY MODIFY THEIR DESIGNATED
         CRITICAL HABITAT

        The threshold for a "may affect" determination and required section 7 consultation is low.
See 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ("Any possible effect, whether beneficial,
benign, adverse or of an undetermined character, triggers the formal consultation requirement.").
Reregistration of diazinon unquestionably "may affect" threatened and endangered species and
their designated critical habitat.  In reregistering diazinon, EPA acknowledged that the "risk
quotients" for diazinon exceed endangered species "levels of concern" for birds, mammals, and
aquatic invertebrates.  IRED at 29-30.  EPA takes the position that when a risk quotient for a
pesticide use exceeds the level of concern the pesticide has the potential to adversely affect the
subject species.

        Diazinon is used in areas where listed species and their designated critical habitat occur.
For example, in 2005, 402,321 pounds of diazinon were used on 719,165 acres throughout
California.  Diazinon is used in 49 of the 58 California counties, including Monterey, Fresno,
Imperial, Kern, San Benito, Sutter, Santa Clara, San Joaquin, San Diego, and Stanislaus where
the highest use occurs.  PAN Pesticides Database, Diazinon Use Statistics for 2005.[1]  More than
50 threatened and endangered species that live in California may be affected by diazinon,
including but not limited to the endangered California condor, endangered southwestern willow
flycatcher, threatened western snowy plover, and endangered peninsular bighorn sheep, each of

---

[1] Available at http://www.pesticideinfo.org/Detail_ChemUse.jsp?Rec_Id=PC35085 (last viewed
Feb. 29, 2008).

Stephen Johnson, Carlos Gutierrez,
Dirk Kempthorne
May 27, 2008
Page 5

which live within one mile of diazinon uses. California Department of Pesticide Regulation, Species by Pesticide at 88-90.[2]

Diazinon use in other parts of the country also has the potential to harm listed species. For example, USGS estimates that over 23,000 pounds of diazinon active ingredient are applied annually within the New England coastal basins, which are the home to many listed species, including but not limited to the endangered Plymouth red-bellied turtle, endangered northern right whale, endangered shortnose sturgeon, threatened piping plover, and endangered Atlantic salmon.

III.    EPA DID NOT COMPLETE CONSULTATION ON THE DIAZINON REREGISTRATION.

Despite the presence of threatened and endangered species in areas where diazinon is used, and EPA's acknowledgment that diazinon may affect endangered and threatened species, EPA did not consult with the Services to ensure that reregistering diazinon would not jeopardize listed species or adversely modify their critical habitat. This failure to consult on an action that "may affect" listed species violates section 7 of the Endangered Species Act.

Furthermore, while EPA has begun to initiate consultation on the effects of diazinon on 26 listed salmonid populations, the California red-legged frog, and the Barton Springs salamander, EPA has allowed continued use of diazinon without completing those consultations. As EPA continues to allow uses of this diazinon prior to completion of consultations, EPA is in violation of section 7(d) of the ESA.

\*      \*      \*

Sincerely,

Joshua Osborne-Klein
Kristen L. Boyles

cc:    Jay Feldman
       Beyond Pesticides
       701 E Street. S.E., Suite 200
       Washington, D.C. 20003

---

[2] Available at http://www.cdpr.ca.gov/docs/endspec/espdfs/spxpest.pdf (last viewed Mar. 11, 2008).

Stephen Johnson, Carlos Gutierrez,
Dirk Kempthorne
May 27, 2008
Page 6


cc:     Debra Edwards
        EPA Office of Pesticide Programs Director
        1200 Pennsylvania Avenue, N.W. (7501P)
        Washington, D.C.  20460

        John Oliver
        NMFS Acting Director
        1315 East West Highway
        Silver Spring, MD  20910

        H. Dale Hall
        FWS Director
        1849 C Street, N.W., Room 3238
        Washington, D.C.  20240